You'll hear argument next in Case 23-1067, Oklahoma v. the Environmental Protection Agency. Mr. Mansinghani. Thank you, Mr. Chief Justice, and may it please the Court. EPA actions to approve or disapprove state implementation plans are the prototypical action reviewed in the regional circuit. As I believe Mr. Stewart confirmed in the previous argument, all parties agree at this point that if EPA had disapproved Oklahoma's and Utah's plans in separate Federal Register notices, those would be locally applicable actions. So when it comes to applicability, the only disputed question is whether the disapprovals of these state plans are transformed into a single national action because EPA chose to process and publish them together with the disapprovals of 19 other states. But the text of the Act's venue provision directs the courts to look at the statutory authority under which EPA took its action, not the form of publication. Here, Section 7410 authorizes EPA to take local action, approval or disapproval of state implementation plans. EPA's position that the form of publication dictates the action's applicability for venue purposes has no basis in the text of the statute and, indeed, is at war with it. That leaves EPA's backup that the Oklahoma and Utah disapproval actions must be reviewed in the D.C. circuit because they are based on a determination of nationwide scope or effect. That exception, however, only applies to actions where EPA arrives at a generic conclusion that applies uniformly to all states and that forms a dispositive reason for the agency's action irrespective of local factors. As Justice Gorsuch's and Kavanaugh's questions earlier today indicate, EPA's reading applying that exception any time EPA articulates a rubric or a standard and then applies it to a local circumstance would mean, essentially, every local EPA action is one that is based on a nationwide determination. The court should reverse the decision below and send this case back to the Tenth Circuit. I welcome the court's questions. You heard the last argument. Factually, how does your case differ from the refinery case? So one major difference is that state plan approvals and disapprovals are explicitly listed in the locally and regionally applicable part of the statute, in the second sentence of the statute. That's not true of renewable fuel standard exemptions. So that makes this like a really easy case for us to say this is locally or regionally applicable. Is the nature of the presumption here different? Meaning there were two, arguably, in the first case nationwide rules, one having to do with focusing just on compliance with legal requirement and the second, the presumption that you couldn't have hardship. Here it's been strange in my mind because you don't actually have to follow the EPA's formula. Correct? That's correct. We don't have to follow their modeling. We don't have to follow their framework. And EPA was very clear about that. Right. So whatever their framework is, since you don't have to follow it, it's hard to see how it has a nationwide effect, isn't it? That's correct. It's not even meets their definition of a determination, which is the conclusive ending of a controversy. If we didn't have to follow their framework, it's hard to see how it's even a determination. The only argument that I see that might be different is that 1% rule that they have. And there's at least a bunch of amici who say that in absolutely every challenge to a SIP, that the 1% rule is being fought about. So could one say that that's determinative in a way that's nationwide? So EPA was also clear that with respect to the 1% rule, it has, quote, not imposed a requirement that states use a 1% threshold. That's at page 9373 of the final Federal Register notice. The other problem is that EPA didn't identify that as one of the nationwide determinations when they were invoking the venue exception. So you have a Chenery problem there, and you also have a problem that the statute requires EPA to make a publication. And of course, this is also a longstanding thing that they've used. In page 47 of their orders, and in EME Homer, so it also doesn't meet their test for that reason, because I guess EPA would consider it settled. When Utah tried to use an alternative as a one parts per billion threshold instead of a 1% threshold, it gave very Utah-specific reasons for why it thought that a one part per billion threshold was more appropriate. And EPA gave very Utah-specific reasons for why it was rejecting Utah's Utah-specific reasons. Counsel, if I might just push back a little bit. I would have thought that, if anything, the intuitive appeal of the idea that your case involves nationwide determinations would be the stronger one in some ways for EPA, given that we're talking here about clean air obligations of states and the downwind impact of any state on others, its good neighbor obligations, as the statute calls it. I mean, gosh, if anything is nationwide impact, it's got to be air pollution, because it travels. Well, the whole statute's about air pollution. But with respect to the good neighbor provision, EPA made clear that interstate ozone transport is a, quote, regional scale pollution problem. You can see that at page 9801 of Oklahoma's proposed disapproval. Yeah, but it crosses the country in ways that don't respect our jurisdictional boundaries between circuits. Sure, and I think at most that makes it something that has regional effects. It's not of regional applicability when EPA disapproves an individual state's plan. So, for example, Oklahoma's plan was disapproved because it was polluting, allegedly, significantly contributing to Texas non-attainment. You've got two circuits right there. And for the reasons that Mr. Houston gave in the prior case, I don't think their two circuit rule really is something that — Why not? We're going to have different interpretations of the statute with different circuits and all these terrible splits, and gosh, we won't have the immediate resolution of the D.C. Circuit that we could have. Well, respectfully, I don't think splits are all that terrible. Oh, oh, oh. This Court's — Really? We deal with them? This Court's landmark Clean Air Act cases, state implementation plan cases, train and Union Electric, both arose from circuit splits where different circuits were adjudicating different state plans, but it touched on cross-cutting issues, such as whether variances could be allowed in a state plan or whether EPA had to consider cost or feasibility — technical feasibility in approving or disapproving a state plan. And there's no indication that those circuit splits that led to this Court's landmark decisions in train and Union Electric were the things that Congress was trying to do away with when it enacted the exemptions. I mean, I thought your original point was that the statute itself, when in section — sentence two talks about what counts as locally or regionally applicable and that should go in the appropriate circuit, includes approval of SIPs. That's correct. I mean, specifically. Specifically approval — So regardless of us thinking that air pollution seems national, Congress was putting it in the local or regional bucket. That's absolutely correct. So are you making the argument, then, that — that the third provision has no application to SIPs and never be applied to SIPs? No, Justice Gorsuch. I'm not making that argument. Ah. So the — You're making the argument that the first doesn't, because we're in the second, locally or regional, and then we go to the exception and we have to decide whether or not it's in the D.C. Circuit, but on the basis of the third prong, not the first one. That's correct, Justice Jackson. So the examples historically that arose prior to the enactment of the exception are both things that relate to SIPs. They weren't SIP approvals or disapprovals, necessarily, but the NRDC cases from the first and D.C. circuits that Mr. Stewart mentioned. The First Circuit said it involved an automatic application of standard nationwide guidelines to all plans that simultaneously preordained wholesale extensions of the attainment deadline. The Dayton Power case from the Sixth Circuit was the other case that led to — at least according to the legislative history — the enactment of this exception. And there, the Sixth Circuit said what was at issue was a uniform rule that had the effect of amending every state's implementation plan in precisely the same way. Were these rules? Say that again, Justice Gorsuch. Were these rules? They — it's hard to say that the amendment of a state plan is a rulemaking, but it was published in the Federal Register as a rulemaking in perhaps what I would say is a single order. And it's those types of things where you have a conclusion that applies uniformly to all states and that forms the dispositive reason for the agency's action that are covered by the exception. It's not the types of things that led to this — this Court's cases in Train and Union Electric where you have an intense mix of very local issues and perhaps some cross-cutting issues that may be true across different states. Not every state was a 1 percent threshold and issue. Not every state was the modeling that made the difference between approval or disapproval. And here, of course, EPA had issued approvals of state plans individually or sometimes in groups and there's no indication that I've seen from EPA that there was a reason why its approvals were issued individually, would go to the regional circuit, and its disapprovals would go to — to the DCA. Can I ask you about the remedy? So if we agree with you that the Court of Appeals here was wrong to hold that this was nationally applicable under Prong 1, would you say that we should remand it to the Tenth Circuit to apply Steps 2 and potentially 3? That would certainly be an option, but not our first preference. So I think this Court has fully in front of it the issue and it's fairly encompassed within the question presented as to whether the exception applies. And I think in elucidating how the exception applies in our case and the Calumet case, it will provide greater guidance to lower courts by showing how it applies in two very different factual scenarios. Should we give the EPA's determination? I mean, that's a thing, right? I mean, EPA, you know, wrote the determination. Does that owe deference? It does not owe deference on the question of whether the action is in fact based on a nationwide determination of scope and effect. And remember, this is a venue provision that we're interpreting, and it's very unusual for this Court to defer to one party or another's choice of venue. Instead, this Court applies the law de novo. And so here the statute, as my friend Mr. Houston said, has two elements. One, that it is based on a determination of nationwide scope and effect. That's reviewed de novo. And second, that EPA publish a finding along those lines. And I think that could be reviewed for arbitrary and capriciousness if EPA chose or didn't choose to publish a finding in any given circumstance, but the first thing is reviewed de novo. Suppose that, you know, of these four determinations, let's just focus, suppose that with just this one which dealt with the contribution threshold, and suppose that the contribution threshold that EPA picked was super low, like so instead of 1 percent, it was .01 percent or something like that. So low that you knew that every SIP was going to get rejected, every state plan. What would the answer be then? I think that would present a closer case, and I think that would get closest to what would be a determination of nationwide effect. So it wouldn't have nationwide scope because, you know, in theory a state could possibly be under that super low threshold, but it might still nonetheless be something that's of nationwide effect. I mean, it's of nationwide, you know, presumably they know what effect this is going to have in every state, in my hypothetical. So it seems actually unusual not to say it would be of nationwide scope. And I'm not suggesting that my hypothetical is at all the same as your case. I mean, actually it seems to me that these four nationwide determinations, the nature of them is you still, the agency still has to do a lot of work before deciding whether to issue, whether to approve any state SIP. But in my hypothetical, that's not right. Basically the nationwide determination is doing all the work. So I'll push back on one thing, Justice Kagan, which is to say that if the screening threshold operates in the same way in your hypothetical as it does in our rule, then yes, there still has to be a lot of work done because the screening threshold is just that. It screens out what are de minimis contributions and what are contributions that have to be further evaluated to determine whether they are significant. So even a really low screening threshold would still require a lot of further analysis to determine whether any given state's contributions to another state are. I take that point. So I guess I was hypothesizing a more simple-minded inquiry where basically this threshold was going to make the difference between approval and not. And it was set at so low a level that it was clear that no state could meet it. And then to me that says, okay, that should be in the D.C. circuit. Like you don't want 11 circuits deciding whether that's a preposterously low level or not. So if it was an automatic, generic conclusion that applied to all states uniformly, you didn't have to really consider what are the state's circumstances, I think that would get very close to meeting the exception. Now, to be very clear, we would think that's very illegal and the EPA doesn't have the ability to set a screening threshold that low and to cabinet and state discretion that much. But yes, a very illegal thing could be adjudicated by the D.C. circuit as very illegal. Do you agree or do you disagree with anything Mr. Houston said in the prior argument in terms of the scope of the third sentence or how much effect the third sentence might have in practice? I think the only gap in our position is that Mr. Houston's position is that the statute alone dictates what the relevant determination is. And I think my test is a little bit more flexible. That said, you know, if Mr. Houston's position is correct, I think we still also prevail because in order to disapprove our state plans, EPA would have to conclude that Oklahoma was significantly contributing to another state. That is the relevant determination. Right. It has to look at the state specific. That's precisely correct. I perceived Mr. Houston's argument to be substantially different than yours. So maybe I'm not understanding. I thought you were taking, you were willing to accept the idea that the third prong allows for a generic conclusion by the EPA that applies uniformly irrespective of factual differences and that that could be enough. And I took Mr. Houston to be saying something different than that. So I take Mr. Houston to be saying that that generic conclusion has to be mandated by statute. I don't quite go that far. But I think otherwise our tests are very similar. Thank you. Thank you, Counsel. Anything further? Thank you. Thank you, Your Honor. Mr. Salen. Mr. Chief Justice, and may it please the Court. The Clean Air Act's venue provision channels challenges to national EPA actions to the D.C. Circuit while channeling challenges to local or regional EPA actions such as SIP, approvals, and disapprovals to the regional circuits. As you heard this morning, EPA attempts to change this neutral venue rule which respects cooperative federalism and the expertise of regional circuits into something very different. There are three fundamental problems with EPA's approach. First, it is at war with the statutory text, including because it requires for it to not devolve into everything being the D.C. Circuit. The creation of multiple non-statutory tests, like whether the bundling of multiple actions is a sham, like whether a determination made somewhere in a federal register preamble is novel. Second, it leads to unadministrable, wasteful litigation about where actions should be brought. We saw this with some of my friends' answers today about how you have to look at all the For these 21 states, how tall the comment letters would be. Piling up next to me, I'd have to read all of them to determine which court that I would need to sue in. And finally, and we haven't heard that much about it today, it leads to an opportunity of significant venue manipulation by EPA that Congress certainly did not envision. I welcome the Court's questions. Just as a matter of curiosity, what is the difference between an action that is nationally applicable and one that is nationwide in effect or scope? So whether an action is nationally applicable is based on the statutory authority under which Congress is acting. So with SIP approvals or disapprovals under 110K, that has to be state-by-state. However, hypothetically, there could be a SIP disapproval or SIP approval that hypothetically could have nationwide effect. The example that we talked about is a complete hypothetical example that we talked about in a reply brief. If the state's pollution problem is so significant that it pollutes across the entire nation, let's say it has that much NOx emissions and it goes all across the nation, theoretically, that locally applicable action would have a nationwide effect. And so that would be an example where the exception would have a real meaning. Now, I want to cover this issue of venue manipulation that hasn't gotten, even though we've been here for like two hours, that hasn't gotten a lot of airing. And I think it's a very problematic aspect of both EPA's arguments on the first two sentences and on its exception. EPA essentially says that if it packages separate actions in a single Federal Register notice subject to an ill-defined sham exception, it can always get into the D.C. Circuit. Further, EPA says that under the exception, if that's not good enough to get them to the D.C. Circuit every time, they can say, well, we can point to any general reasoning, which as Justice Gorsuch pointed out is just non-arbitrary, capricious rulemaking under the APA, and say that that sends us to the D.C. Circuit under the third prong. It is that amount of power for EPA to essentially take local and regionally applicable actions and send them to D.C., send them here, is at war with the Clean Air Act's cooperative federalism regime. And with regard to SIPs, which are a big part of that, in particular, the whole notion of SIPs, including with transport SIPs, is that those are state-specific. Those are decisions made by the states how to control pollution coming from sources in the state. The venue provision here is just part and parcel of that, that when you have those state-specific decisions, you don't have to go to D.C. to litigate the legality of that. You get to stay in your own backyard. And the cases here, the ones that are pending in the lower courts, are a stark example of what would happen if you allow EPA to essentially subvert this regime. Can I ask you about your view of remand? Would you object if we reversed the decision on the nationally applicable prong and sent it back to the Tenth Circuit for a determination of whether or not there is, the exception applies here? Certainly, I never want to turn down a win, but I would say that one of the arguments made by EPA in opposition to our cert petition was that they hadn't, was that the Tenth Circuit hadn't decided that question. And our answer in our reply brief wasn't like, give us a round trip. It was that the issue had been fully briefed, it had been decided in other circuits, and this court would be fully able to answer it. We've now been here for, we've got a lot of pages of briefing, had a lot of oral arguments. I think that this court is now in a good position to decide the meaning of that, meaning of that third sentence and to apply it both in the Calumet case and in our case here. And so just to finish my thought, when thinking about what would be the consequence of allowing EPA to jam all these cases into the D.C. Circuit, we took a look at how many pages in the Sixth Circuit, in the Sixth Circuits that are currently taking briefing in these cases focused on specific issues. And we counted up to 300 pages of just merits briefing that were focusing on just the specific issues, not to say on the background section. To say that all of this could be jammed into the D.C. Circuit and that these local, intensely local issues, quintessentially local issues, would be able to practically get a fair airing is, I think, don't think, not realistic and not what Congress envisioned. Now I will say that we do have a different wrinkle in the way we approach the third sentence, which I think – I thought your point on the venue was just convenience, not – or is there more to it than that? Sorry. In other words, you want to be able to litigate in your home. You know, it's more convenient to litigate in the circuit, in the home. It's more convenient. It's also – Is there anything else to it that you're – is behind – any other premise behind your comment there? Yeah, it's – I guess it depends how you define the word convenient. I mean, that you get to litigate your issues without being jammed in with folks that want to submit 270 pages of briefing on issues in different parts of the country. SIPs are quintessentially – decisions on SIPs are quintessentially local. You know, we had – you know, there was – there was, you know, again, the comment – Well, the premise there – I'm not going to dispute it too much, but, you know, they get fair attention in both courts. It is true that the – you know, the judges of the D.C. Circuit are excellent judges and work very hard, but – And they're not afraid to rule against EPA pretty routinely either. When justified. When justified. But I would also say that as a practical matter, when you get – when you get consolidated in the D.C. Circuit, the fight for word count and page count to that is – I mean, I don't – those of you who have – it is fierce to get a couple of pages on these local specific issues. You know, these 300 pages, you know, there are – you know, when I thought our case was being transferred to D.C., thinking about how things that I had 15 pages to say I would now have two pages to say, three pages to say, that was a daunting thought and certainly not what Congress envisioned when it's specifically listed in the second sentence. The SIP approvals and disapprovals go to the regional circuits. Mr. Saitlin, explain to me how, notwithstanding the four determinations, how a SIP approval would vary among states. Like, what – what would the variations be, notwithstanding that the EPA has made these four nationwide determinations? Well, if you're talking about the third sentence, our approach to the – I'm talking about the third sentence. Our approach to the third sentence is somewhat different. While it does ultimately lead to the same result as my friends in the states – But mostly I'm not talking about any sentence. I'm actually just talking about, like, your sense of the practicalities of the situation. You come in with a SIP. EPA has to approve it. It has to disapprove it. They've said these four things, which apply uniformly to all their approval, disapproval decisions. But I'm taking it that you're saying, notwithstanding that they've said those four things, the supposed common denominator actually pales in significance relative to the state-specific circumstances and situations and arguments and so on. And I think I want a little bit more meat on the bones as to what that would – what that means. Yeah. So, I mean, I will say that those kind of observations are not really relevant to either one of our aspects of our tests. You know, our first test for applicability is just – I just want, like, your sense of, like, what happens. Okay. Well, what happens is, for example, on the 1 percent threshold. You know, Utah's and, you know, Pacific Corp was my client there. Our submission was that, you know, with regard to states in the West, the 1 percent doesn't make sense. And we use an example – No, that's not what I'm saying. Suppose we take these four nationwide determinations and we just assume that the EPA is going to apply them uniformly. Is there still work to be done as to any SIP approval, disapproval decision? Yes, of course. So what is the – what is the non-common denominator work that remains to be done? The space-specific arguments. For example, in Utah, we made the argument that we are like Arizona. And Arizona, a couple years before, EPA had declined to apply the 1 percent threshold essentially because the downstate pollution there was to California and the mountains were essentially trapping most of the – most of the pollution there. And so the one – there was so much – so little import to the contribution that Arizona was making to California that it wouldn't make any sense to apply the 1 percent threshold. We said, we in Utah, we're told that we're triggering monitors in the Denver area. We said, look, there's mountains around Denver. It's trapping it over there. And so treat us like Arizona. Now, that is a very specific regional specific thing that, you know, I wouldn't get to our – you know, it would get lost in the D.C. circuit. And also, it is not one of the four determinations. It's something very particular. Thank you, counsel. Justice Thomas, anything further? It doesn't get lost. I'll just say that. I'm sorry. Justice Gorsuch, anything? Yeah, but there are four things, right? I mean, the EPA says they're uncommon to all. And wouldn't it be efficient to have those determined in one venue with excellent judges who pay close attention to them? And then any other regional matters to resolve regionally? Yeah, well, as – And that would be a good system too, right? Certainly, that would be a system that Congress could enact further. Further the way that, you know, that, you know – Justice Kavanaugh. Just to make sure on deference, are you saying no deference to EPA's determination that it's nationwide scope and effect? My position is the same as Mr. Houston, but I will have one additional – sorry. Yeah, go ahead. My additional wrinkle is that regardless of whether the court believes that deference is warranted to when EPA apprised the proper framework, here there's no deference to the fact that the finding that they made was on the wrong thing. So if you take a look at the Federal Register notice, the only thing that they're finding as a nationwide determination of scope and effect is based on the fundamental flaw that applies to the first and second sentence, which is that they think that the action is all 21. So the fact that they identified the wrong action wouldn't be entitled to deference no matter what – I understand that point. Okay, thank you. Justice Barrett. Justice Jackson. You said a couple of times that your approach to the third sentence differed, but you never quite got out how so. Yeah, so the sentence – the key sentence is if such an action is based on a determination of scope – of nationwide scope and effect. We think that the word of is ambiguous. We take the states and maybe EPA to read of as if such an action is based on a determination that has a nationwide scope and effect. We read that of to be in – if such an action is based on a determination of that action's nationwide scope and effect. And I think if – you know, as this opinion writes, I think if you take a look at that, that is the most administrable rule that can be made for the third sentence, and it gives it real import even though it's in a limited number of cases. Thank you. Thank you, counsel. Mr. Stewart, welcome back. Thank you, Mr. Chief Justice, and may it please the Court, let me just make two or three quick observations and then take questions. The first is that there's been colloquy in both of these cases about the propriety of EPA getting deference on a question about what forum the case will be heard in. Under the statute, EPA has some influence on the question whether the case – all challenges to a particular action will be heard in a centralized forum or whether instead they can be brought all throughout the country. And if EPA chooses the former course, the fact that the cases go to the D.C. Circuit, the fact that the D.C. Circuit is the centralized forum, that's the choice of Congress. That's not the choice of EPA. And so it's not the case that EPA can direct challenges to whatever court it  The second thing I would say, and this goes back to the NRDC cases that I mentioned earlier, that when Congress was studying the venue provision in preparation for the 1977 amendments, it had in mind the SIP approval actions that had taken place and been challenged in the NRDC cases. And when it chose the path that EPA's general counsel recommended rather than the path that ACUS recommended, it wanted to ensure that there was some mechanism available for review of national issues, even when they pertained to the approval or disapproval of SIPs. And finally, Justice Kagan, you said something to the effect that under EPA's framework here as opposed to the framework in the case before, even once you got past the 1 percent threshold, the questions about the propriety of the 1 percent de minimis threshold, there was still a lot of work to be done. And I think the analysis is complicated, but at the end of the day, EPA disapproved 21 plans. It approved, I think, 23. I believe that all 23 plans that were approved were approved on the ground that the state fell under the 1 percent de minimis threshold. So as a practical matter, the determination of whether a particular state exceeded the 1 percent threshold had great predictive effect in terms of whether the plan would be approved or disapproved. I welcome the Court's questions. But once you got past the 1 percent threshold, which they have in common, the rest of it seems quite particularized. And how would you deal with that as opposed to the refineries where we were only talking about a couple of factors? Well, I would say they do require analysis of particular state circumstances, but they are still national in scope, and they still were contested. That is, EPA received comments indicating that challenges to even the subsequent steps of the analysis were not simply going to be, we accept these factors, but we think we satisfy them. There were going to be challenges to the factors themselves. There has been talk about the benefit of having a simple and straightforward standard, and I think that is true. I also think the point Mr. Saitlin makes is a significant one, too, that if you're, whatever you want to put it, more at home in your local circuit and less likely to get lost in the shuffle here in Washington. And I wondered if you had a response to his concern in that respect. I mean, I think that just, I mean, part of the awkwardness of the case is, the extent of the statute is, the extent to which that is so depends on the extent to which your challenges are to the national criteria that EPA has promulgated, or whether they are to the way in which those criteria are applied to your own state-specific circumstances. And the more that the latter is the case, the more it makes sense to be in the regional circuit. The reason I say it's an awkwardness of the statute is, the statute requires that the venue determination be made at the time that the action is taken, and it doesn't take into account what set of challenges do particular petitions for review choose to make. And so the best we can do is have a test that tries to use proxies for actions that are, as to which the national determinations are likely to be the focus of judicial review. So the statute does look at the action at the time it's taken, and sentence two very clearly puts these kinds of actions, the SIPs, in the local or regional bucket. So I guess I'm confused as to why the government is even taking the position that the first bucket is applicable here. I mean, we see the specification of SIP decisions in prong two as referring to decisions regarding an individual SIP. And to the extent that we publish approvals or disapprovals of particular state SIPs on a one-to-one basis, we would agree that those are regionally let — So you think the statute was really meant to distinguish between one and two on the basis of the EPA's publishing determinations? Well, I would say that the statute was meant to distinguish between one and two on the basis of the action that EPA took. And if you regard what EPA did here as simply a disregard, we think of it as more than that. In the same way — Are they materially different? If what the EPA did here was separate out — I mean, I understand I see one publication that lists each state separately and has the analysis for each state separately. If EPA put a page break between each one of the states and published them differently, would you say that's a sentence two scenario? I don't think a page break would be enough. But if EPA issued different — you know, on 21 consecutive days, all applying the — With the same content. Exactly the same content. With the same kind of content as to the nationwide part of it, and then each one with a different analysis, how does this content, the nationwide content, apply to the particular state involved? Then we would say that's a series of discrete state-specific actions. And in a way, the most straightforward way for us to prevail in this case ultimately is on prong three, because the analysis under prong three doesn't depend on what, if any, weight the court gives to EPA's decision to issue these — all of these in one Federal Register notice. So on the prong three determination, what is your view as to why this is still driven? I understand that you have four factors and you're applying the four factors, and we would hope that that would be the case, that you would be assessing each state consistently using a set of criteria. But I take your point that that's enough to make it a determination of national scope or application? Well, I mean, it is partly that they were the four criteria we were going to use. It was partly that they, at least to a degree, were new and contested. We anticipated from comments we received on the proposed disapprovals that the states would contest the methodology, not just its application. The other thing I would say is all of the states whose plans were disapproved had proposed to take no further ameliorative action with respect to ozone transport beyond what they were already doing. So it would have been a much more complicated analysis if various states had been planning to improve their plans in different ways and EPA was required to make state-by-state determinations as to, is this good enough? Instead, we approved a lot of plans for states that fell below the 1% threshold, disapproved a lot of plans for states that, in our view, fell above it, and that didn't propose to do anything additional. So you knew the challenges were going to be to the four factors because the plans in all the states was to do nothing. And so it had to challenge the factors that you were using. We anticipated that and we had confirmation of that from the fact that we had published proposed disapprovals for each of the states and had saying this much. Yes, exactly. And so, again, as I take it, you're consistent between the two cases in this respect, you're saying there are new criteria, that's what's going to get challenged, that should go to the D.C. Circuit, and maybe 10 years later when the criteria are settled and it really does turn on local factors, then the regional circuits can take over again. Yes, exactly. But isn't it here how those factors are actually working and the differences in the modeling in each state that is driving the determination? I mean, I think this goes back to Justice Kagan's points earlier that, yes, the factors are new, they're going to be contested, and if those factors had necessarily come out the same way because we didn't really care about the application, then perhaps it would make sense to have the D.C. Circuit doing it. But if you're applying new factors and it matters that you are Denver versus, you know, Arizona or whatever in terms of how the modeling works, I guess I don't see how this is necessarily the same as the refinery determination. I mean, there's an obvious difference in outcomes in the sense that with the refineries, we ultimately denied all 105 of the exemption applications, whereas with the various state plans that EPA got, we disapproved 21 of them and approved 23 or plus or minus one or two of that. So we were approving a little over half the plan submissions. In that case, it looks as though there's more, and there is more, state-specific variation in outcome. The two things I would say are a determination can be, a nationwide determination can be central to the analysis and be the focus of judicial scrutiny and be the sort of thing that, for which centralized review is important, even if it doesn't kind of preordain the outcome of a particular matter. And then the second thing I would say is with respect to the state-by-state did you fall above or below the 1%? I know, but we're in the exception. I mean, the thing that troubles me about your first point, at least, is that we've already determined in the structure of the statute that these are local because we're in prong three. And the exception, I would think, would just be identifying the particular circumstances in which, even though we know we have state-specific variation that matters, that's why we're local, we're still going to say, no, this is really being driven in a significant way by the national determination. And so I guess I just don't, it's hard for me to square that understanding of the structure of the statute and the fact that we're in an exception with an argument that says, yes, but there's a national standard doing some work here. Well, I mean, obviously the only people who are going to seek judicial review are people who didn't get the result that they want from the agency. And so in the case of SIP disapprovals, the disappointed parties would predominantly be states, to some extent, industry. And so you would have to ask, if you were trying to route to the D.C. Circuit the recurring national issues while leaving local issues to the regional circuits, you'd want to be anticipating as best you can, are the people who are disappointed by this decision likely, in the main, to challenge it on the ground that the national framework was no good, or in the main, will they argue that, even accepting the national framework, the outcome should have been different in my case? Again, based on both kind of the nature of the inquiry and the comments we had received on the proposed disapprovals, EPA anticipated that, in the main, the challenges would be to the nationwide aspects. And although it's not directly relevant to the venue question, that's been borne out in practice. The people who have challenged the SIP disapprovals in the regional circuits have primarily focused on the nationwide framework rather than on the site-specific application. In your rebuttal in the earlier case where you said some cases vented up in the D.C. Circuit without being challenged, the venue being challenged, and I think that's right, were you referring, though, to the prong one cases or prong three cases? I mean, I think in most of these cases, it would, EPA would identify both in the rulemaking as bases for D.C. Circuit venue. And so, as happened in these Federal Register notices. They're both prong one and three. And because the people sued in the D.C. Circuit and nobody contested venue, it wasn't But the point, I think the point would be, is different if it were an exclusively prong three situation. I think that's right, although Then it would, you get my point. Yeah. And my response to Mr. Houston was just to the effect that the fact that we can't point to published Court of Appeals opinions that have upheld prong three findings by EPA is more a function of those findings not being challenged in prior litigation than it is of we make findings, prong three findings, and sometimes they're struck down, but they're never upheld. That hasn't been the case. We're not aware of any case in which EPA has made a prong three finding and a court has disapproved it. I guess the last thing I wanted to say is I've always been mused in these papers by references to the D.C. Circuit as a hometown court for EPA, because if location in D.C. meant that the D.C. Circuit is a hometown court, then this court would be a hometown court for EPA, and I've never had that perception. Thank you, Mr. Chief Justice. Yeah, anything further? Thank you, counsel. Mr. Mansinghani. Thank you, Mr. Chief Justice. Two quick points. To Justice Kagan's question about whether the four determinations were sort of the be-all, end-all here, and it seems like Mr. Stewart seemed to think so with the 1 percent threshold. You know, if you look at Oklahoma's plan, Oklahoma said, look, even though we're above the screening threshold, here's why our contributions are not significantly going to contribute to nonattainment downwind. Look at the trends in Oklahoma's emissions due to the specific structure of the southern power pool and to how Oklahoma operates its electric generating fleet, and look at the dropping ozone levels in downwind states like Texas because of mobile source changes. EPA rejected those rationales, but nonetheless, those were state-specific things that ended up controlling the decision. Similarly with Utah. Utah said, based on a weight of the evidence analysis, we don't think we're significantly contributing because in the West, as EPA had prior determined with states like Arizona and California, the relative contributions are relatively low, around 6 to 7 percent are coming from other states, very different from what's happening in the east. So these were all very state-specific things that EPA had to adjudicate even after it got passed, all of those four determinations. The second thing I wanted to talk about was where we are with the text of the exception. You know, Mr. Stewart's test has a lot of atextual things to it. Well, it has to be a determination, but a new one, not an old one. We have to try to figure out what part of the action litigants are likely to challenge. Are they likely to challenge the local aspects or the national aspects? That seems like a very hard to adjudicate venue test, and it's also something that doesn't come from anywhere in the statute. I think our test comes from the words based on, which in this court's Foreign Sovereign Immunities Act decision in Sachs, I think takes a similar approach as we do. It has to be the gravamen or foundation of the action and not just an element. And in that case, this court declined to apply the commercial activities exception in a unanimous decision, even though plaintiffs had alleged commercial activities because the court said that alleging all of those things alone still entitled plaintiffs to nothing. But then you also couple that with the fact that I think the third sentence has to be read in conjunction with the first two. It has to be things like are in the first sentence, like the setting of a national uniform air quality standard or a national uniform standard of performance for sources. Couple that with the types of cases that we talked about, like the NRDC cases and Dayton Power cases, and the fact that this is a venue clause, so it shouldn't be manipulable, and the fact that it's an exception, so it shouldn't be read to swallow the rule. I think all of that leads to our test. Thank you, counsel. The case is submitted.